UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

LANDMARK FINANCIAL
CORPORATION,
    Plaintiff,


    v.
                                                     CIVIL ACTION NO.
                                                     10-10372-NMG

FRESENIUS MEDICAL CARE
HOLDINGS, INC. d/b/a FRESENIUS
MEDICAL CARE NORTH AMERICA,
    Defendant.


**REPORT AND RECOMMENDATION RE:
MOTION FOR PARTIAL SUMMARY JUDGMENT ON BEHALF
OF PLAINTIFF (DOCKET ENTRY # 59); DEFENDANT
FRESENIUS MEDICAL CARE HOLDING, INC.'S
MOTION FOR SUMMARY JUDGMENT
(DOCKET ENTRY # 52)**

**March 16, 2012**


**BOWLER, U.S.M.J.**

Pending before this court is a motion for summary judgment
filed by defendant Fresenius Medical Care Holdings, Inc. d/b/a
Fresenius Medical Care North America ("Fresenius"), a
Massachusetts company which provides dialysis services to
individuals with end stage renal disease.  (Docket Entry # 52).
Fresenius seeks summary judgment on all counts in the four count
complaint filed by plaintiff Landmark Financial Corporation
("Landmark"), a New Jersey corporation that provides financial
and consulting services to various companies.  Landmark, in turn,
moves for partial summary judgment on the breach of contract

claim.  (Docket Entry # 59).  After conducting a hearing in October 2011, this court took the summary judgment motions (Docket Entry ## 52 & 59) under advisement.


PROCEDURAL BACKGROUND

The parties' dispute revolves around Landmark's entitlement to a finder's fee under the terms of a letter agreement ("the letter agreement").  The four count complaint sets out the following causes of action:  (1) breach of contract (Count One); unjust enrichment (Count Two); breach of an implied covenant of good faith and fair dealing (Count Three); and (4) violation of section 11 of Massachusetts General Laws chapter 93A ("chapter 93A") (Count Four).


STANDARD OF REVIEW

The standard of review of a summary judgment motion is well established.  Summary judgment is designed "'to pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required.'"  <u>Davila v. Corporacion De Puerto Rico Para La Difusion Publica</u>, 498 F.3d 9, 12 (1st Cir. 2007).  It is appropriate when the summary judgment record shows "there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law."  Rule 56(c), Fed. R. Civ. P.  "A dispute is genuine if the evidence about the fact is such that a reasonable jury could

resolve the point in the favor of the non-moving party."
American Steel Erectors, Inc. v. Local Union No. 7, International
Association of Bridge, Structural, Ornamental & Reinforcing Iron
Workers, 536 F.3d 68, 75 (1st Cir. 2008).  "A fact is material if
it carries with it the potential to affect the outcome of the
suit under the applicable law."  Id.

Facts are viewed in favor of the non-movant.  Noonan v.
Staples, Inc., 556 F.3d 20, 23 (1st Cir. 2009).  When the summary
judgment target has the underlying "burden of proof and the
evidence on one or more of the critical issues in the case is not
significantly probative, summary judgment may be granted."
Davila v. Corporacion De Puerto Rico Para La Difusion Publica,
498 F.3d at 12 (internal quotation marks, citation and ellipses
omitted); accord Clifford v. Barnhart, 449 F.3d 276, 280 (1st
Cir. 2006) (if moving party makes preliminary showing, nonmoving
party must "produce specific facts, in suitable evidentiary form,
to establish the presence of a trialworthy issue" with respect to
each element on which he "would bear the burden of proof at
trial") (internal quotation marks and citations omitted).

Where, as here, the parties filed cross motions for summary
judgment, the court must "determine whether either of the parties
deserves judgment as a matter of law on facts that are not
disputed."  Barnes v. Fleet Nat'l Bank, N.A., 370 F.3d 164, 170
(1st Cir. 2004).  Each summary judgment motion is reviewed
separately and factual disputes are resolved in favor of the

nonmoving party.  See Saenger Organization, Inc. v. Nationwide Insurance Licensing Associates, 119 F.3d 55, 56 (1st Cir. 1997).

Fresenius and Landmark both submit a statement of undisputed material facts in support of their summary judgment motions. Uncontroverted statements of fact in the LR. 56.1 statement comprise part of the summary judgment record.  See Cochran v. Quest Software, Inc., 328 F.3d 1, 12 (1st Cir. 2003) (the plaintiff's failure to contest date in LR. 56.1 statement of material facts caused date to be admitted on summary judgment); Stonkus v. City of Brockton School Department, 322 F.3d 97, 102 (1st Cir. 2003) (citing LR. 56.1 and deeming admitted undisputed material facts that the plaintiff failed to controvert).  With this framework in mind, the summary judgment record is as follows.

<center>FACTUAL BACKGROUND</center>

Landmark provides corporate financial and consulting services with particular focus on companies in the healthcare industry.  (Docket Entry # 73, ¶ 1; Docket Entry # 61, ¶ 1). Among the services it provides are strategic mergers and acquisitions, divestitures, recapitalizations, valuations and licensing arrangements.  (Docket Entry # 73, ¶ 1; Docket Entry # 61, ¶ 1; Docket Entry # 53, Ex. B, pp. 38-46).  Fresenius provides dialysis services to individuals suffering from end stage renal disease through its operation of freestanding

dialysis clinics in the United States. (Docket Entry # 67, ¶ 1; Docket Entry # 56, ¶ 1). Additionally, Fresenius maintains a portfolio of products necessary to treat end stage renal disease, including pharmaceutical products and dialysis machines. (Docket Entry # 67, ¶ 1; Docket Entry # 56, ¶ 1; Docket Entry # 53, Ex. A, pp. 10-11).

In 2005, Fresenius undertook the Renal Drug Initiative ("RDI"), a project to identify acquisition candidates in North America and worldwide regarding drugs used in conjunction with dialysis.[1] (Docket Entry # 62, Ex. 7, p. 77; Docket Entry # 61, ¶ 5). Such acquisitions would allow Fresenius to control a further aspect of making, selling and delivering end stage renal disease services thereby furthering potential for profits.[2] (Docket Entry # 62, Ex. 8, pp. 18-19; Docket Entry # 61, ¶ 5). John Moroney ("Moroney"), President of Landmark, began discussions with Liam Walsh ("Walsh"), Vice President of Finance at Fresenius, and Richard Van Zandt ("Van Zandt"), Director of New Business Development for Fresenius, regarding Landmark assisting Fresenius in locating renal drug manufacturers with whom Fresenius might enter into a business arrangement. (Docket

---

[1]  Fresenius asserts that it undertook the RDI in 2004. (Docket Entry # 73, ¶ 5; Docket Entry # 73, Ex. A, p. 10).

[2]  Fresenius disputes that it pursued the RDI to increase potential for profits or to have control of renal drugs. Instead, Fresenius claims that RDI would expand access and knowledge of the drugs used in dialysis thereby allowing Fresenius to develop treatment algorithms to achieve the best clinical outcomes for its patients. (Docket Entry # 73, ¶ 5; Docket Entry # 73, Ex. B, pp. 53-53).

Entry # 67, ¶¶ 4-5; Docket Entry # 56, ¶¶ 4-5; Docket Entry # 53,
Ex. B, pp. 59-60 & Ex. C, p. 52).  After a meeting in August
2005, Mark Blomquist ("Blomquist"), Executive Vice President of
Landmark, sent a draft retainer agreement to Fresenius for
Landmark to assist in identifying prospective drug manufacturers
of a ferric gluconate drug.  (Docket Entry # 73, ¶¶ 7-8; Docket
Entry # 61, ¶ 7; Docket Entry # 53, Ex. B, p. 13 & Ex. E).

The draft retainer agreement states that Landmark would:

> assist [Fresenius] in identifying . . . Candidates . . .
> facilitate preliminary contracts with the Candidates on
> behalf of [Fresenius]; assist [Fresenius] in the evaluation
> of the suitability of the Candidates physical plant,
> personnel, intellectual property, regulatory compliance,
> financial strength, and intellectual property position for
> manufacture of the Product for [Fresenius].  Give aid and
> advice to [Fresenius] in evaluating various potential
> transactions with the Candidates and assist in the
> development of negotiating positions and alternative
> structures . . ..

(Docket Entry # 67, ¶¶ 9-10; Docket Entry # 56, ¶¶ 9-10; Docket
Entry # 56, Ex. E, p. 2).  This language was intended to cover a
wide variety of deal structures and for these services Fresenius
would pay Landmark $50,000.  (Docket Entry # 67, ¶¶ 10-11; Docket
Entry # 56, ¶¶ 10-11; Docket Entry # 56, Ex. E, p. 3).

The draft retainer agreement also provided for a "success
fee equal to five percent (5%) of any consideration paid by
[Fresenius] to the Candidate" if Fresenius were to "acquire[] or
make[] an equity investment in a Candidate during either the term
of this agreement, or for a period of two years thereafter . .
.."  (Docket Entry # 67, ¶ 12; Docket Entry # 56, ¶ 12; Docket

Entry # 56, Ex. E, p. 3). Moroney testified that the term "acquire" meant obtaining ownership or equity interest in a company or product.[3] (Docket Entry # 67, ¶¶ 13-14; Docket Entry # 56, ¶¶ 13-14; Docket Entry # 53, Ex. B, pp. 23, 31-32). He further testified that a licensing agreement is different from an acquisition because the licensor continues to own the product and the licensee gets to use that product over a period of time.[4] (Docket Entry # 67, ¶ 16; Docket Entry # 56, ¶ 16; Docket Entry # 53, Ex. B, pp. 27, 46-47). In its marketing materials and work with clients, Landmark distinguishes between acquisitions and licensing agreements. (Docket Entry # 67, ¶ 17; Docket Entry # 56, ¶ 17; Docket Entry # 53, Ex. Ex. B, p. 47).

The parties did not accept the draft retainer agreement. (Docket Entry # 73, ¶ 8; Docket Entry # 61, ¶ 8). Instead, they continued discussions as Fresenius' objective shifted from a potential manufacturing agreement to some form of acquisition. (Docket Entry # 62, Ex. 14(18); Docket Entry # 61, ¶ 8). During this time period, Landmark indicated that it was primarily interested in a success fee for acquisitions rather than a fixed consulting fee. (Docket Entry #73, ¶ 9; Docket Entry # 62, Ex. 5, pp. 87-88 & Ex. 7, p. 120; Docket Entry # 61, ¶ 9). In a

---

[3] Moroney's subjective belief regarding the meaning of "acquire" is not relevant because contracts depend upon "objective indicia of consent, not on a party's subjective expectations." <u>Louis Stoico, Inc. v. Colonial Development Corporation</u>, 343 N.E.2d 872, 875 (Mass. 1976).

[4] See footnote three.

letter dated January 24, 2006 sent to Landmark, Fresenius proposed various terms for the parties' relationship. (Docket Entry # 73, ¶ 10; Docket Entry # 61, ¶ 10; Docket Entry # 53, Ex. G). Landmark accepted these terms and the parties agree the letter constitutes the letter agreement and governs their relationship. (Docket Entry # 73, ¶ 11; Docket Entry # 61 ¶ 11). Under the agreement, Fresenius retained Landmark:

> as a non-exclusive finder and advisor to [Fresenius] . . . to provide general advisory and consulting services in connection with locating and evaluating prospective candidates . . . for [Fresenius] to (i) contract with . . . for the manufacture of an administratable drug for renal patients in the form of, or similar to, ferric gluconate, iron sucrose, calcitriol, calcium acetate, or calcium carbonate (the "Product") . . . or (ii) acquire an entity that manufactures the Product (a "Transaction", as further defined below).

(Docket Entry # 53, Ex. G, p. 1). For these services, Fresenius agreed to pay "[an] initial fee of $50,000.00, payable within thirty (30) days following the execution of this Letter Agreement by both Parties." (Docket Entry # 53, Ex. G, p. 2). Fresenius paid a total of $200,000 to Landmark, including the initial fee of $50,000 and three additional payments. (Docket Entry # 67, ¶ 21; Docket Entry # 56, ¶ 21; Docket Entry # 53, Ex. B, pp. 158-59, 166).

The letter agreement provided for additional compensation in the event of a "transaction." Specifically, Fresenius would pay Landmark on a sliding scale depending on the consideration involved in the transaction, set out as follows:

1.  5% of the Consideration from $1 and up to $3,000,000,
        plus
        2.  4% of the Consideration in excess of $3,000,000 and up
        to $6,000,000, plus
        3.  3% of the Consideration in excess of $6,000,000 and up
        to $9,000,000, plus
        4.  2% of the Consideration in excess of $9,000,000 and up
        to $12,000,000, plus
        5.  1% of the Consideration in excess of $12,000,000.

(Docket Entry # 53, Ex. G, p. 3).  This transaction fee replaced

the success fee that Landmark proposed in the draft retainer

agreement.  (Docket Entry # 67, ¶ 22; Docket Entry # 61, ¶ 12;

Docket Entry # 56, ¶ 22).

        The letter agreement defined "Consideration" as:

        the full transaction value of any Transaction including,
        without limitation, the total value of all cash, securities,
        other property and any contingent, earned or other
        consideration paid or payable, directly or indirectly, by an
        acquiring party to a selling party . . ..

(Docket Entry # 53, Ex. G, p. 4).  The letter agreement defined

"Transaction" as "acquir[ing] an entity," further elaborating

that:

        The Transaction shall include any single transaction or
        series of combinations of transactions, other than in the
        ordinary course of trade or business whereby, directly or
        indirectly, control of a material interest of a Candidate or
        any of its businesses or assets is transferred for
        Consideration (as defined below) to [Fresenius].  A
        Transaction shall include, a sale or exchange of capital
        stock or assets, a merger or consolidation, a tender or
        exchange offer, leveraged buyout, the formation of a joint
        venture, majority investment or partnership, or any similar
        transaction.

(Docket Entry # 53, Ex. G, pp. 1, 3).

        Under the section entitled "Compensation" in the letter

agreement, Fresenius had the "sole discretion in determining what

constitutes an acceptable Transaction" and Landmark would only earn the transaction fee "upon the closing or receipt or delivery of funds from the completion of a Transaction, and not merely from presenting a Candidate that in [Fresenius'] sole discretion is unacceptable."[5] (Docket Entry # 53, Ex. G, p. 3). The letter agreement also provides that Massachusetts law will govern any disputes arising under the letter agreement. (Docket Entry # 53, Ex. G, p. 4). The letter agreement was to expire on July 31, 2006, unless the parties agreed in writing to extend the term. (Docket Entry # 53, Ex. G, p. 4). The expiration of the letter agreement, however, had no effect on the compensation section of the letter agreement, which remained in full force and effect. (Docket Entry # 53, Ex. G, p. 4).

In 2006, Landmark began investigating branded iron companies pursuant to the letter agreement of which there were only two sources: Luitpold Pharmaceuticals, Inc. ("Luitpold") and Watson Pharmaceuticals, Inc. ("Watson"). (Docket Entry # 73, ¶¶ 14-15; Docket Entry # 62, Ex. 9, p. 27 & Ex. 10, p. 54; Docket Entry # 61, ¶¶ 14-15). Van Zandt authorized Landmark to pursue an exploratory contract with Luitpold without identifying Fresenius as the interested party. (Docket Entry # 73, ¶ 17; Docket Entry

---

[5] Landmark denies the implication that the letter agreement "gave Fresenius the 'sole discretion' to determine that a Transaction Fee was to be paid if it proceeded to do a deal with a Candidate that had been presented by Landmark." (Docket Entry # 67, ¶ 23). Landmark argues that if Fresenius proceeded to a transaction, "it had at least tacitly found the Candidate 'acceptable' and not 'unacceptable.'" (Docket Entry # 67, ¶ 23).

# 62, Ex. 7, p. 124; Docket Entry # 61, ¶ 17). Blomquist subsequently initiated contact with Mary Jane Helenek ("Helenek"), President of Luitpold, about interest in acquiring rights to the drug Venofer, at which point Van Zandt authorized disclosure of Fresenius' involvement. (Docket Entry # 73, ¶ 17; Docket Entry # 62, Ex. 7, pp. 130-131; Docket Entry # 61, ¶ 17). Landmark arranged a meeting between Fresenius and Luitpold, which took place on November 13, 2006, but the parties were unable to reach a deal at that time. (Docket Entry # 73, ¶ 19; Docket Entry # 62, Ex. 7, p. 171, Ex. 9, pp. 122-23; Docket Entry # 61, ¶ 19). During the meeting, Van Zandt expressed interest in acquiring Venofer but Helenek informed him that she did not "have the authority or the rights to just sell the product." (Docket Entry # 73, ¶ 19; Docket Entry # 73, Ex. H, pp. 88-89).

Luitpold did not own Venofer but rather had a license from Vifor International, Inc. ("Vifor"), Luitpold's owner, to manufacture, market, sell and distribute Venofer in North America.[6] (Docket Entry # 67, ¶¶ 29-30; Docket Entry # 56 ¶¶ 29-30; Docket Entry # 56, Ex. I, pp. 19-21). Meanwhile, no later than January 2005, Fresenius' corporate parent, Fresenius Medical Care AG & Co., KGaA ("Fresenius AG") had been investigating the possibility of acquiring Vifor or Vifor's corporate parent, the

---

[6] Luitpold's master licensee agreement with Vifor does not expire until 2028. (Docket Entry # 67, ¶ 30; Docket Entry # 56 ¶ 30; Docket Entry # 56, Ex. H, p. 42).

Galencia Group ("Galencia") as a means of obtaining Venofer.[7]

(Docket Entry # 73, ¶ 16; Docket Entry # 73, Ex. A, pp. 10, 17-

20, C & F).  Discussions between Galencia and Fresenius AG

concerned an international arrangement whereby Fresenius would

distribute Venofer, a non-acquisition opportunity.  (Docket Entry

# 73, ¶ 19; Docket Entry # 73, Ex. A, pp. 18, Ex. H, pp. 119).

As a result, Helenek wished to pursue non-acquisition

opportunities with Fresenius.  (Docket Entry # 73, ¶ 19; Docket

Entry # 73, Ex. H, p. 119).  Landmark however advised Van Zandt

to pursue acquisition.  (Docket Entry # 73, ¶ 19; Docket Entry #

73, Ex. I).

After the November 13, 2006 meeting, Landmark scheduled

another conversation with Helenek for December 22, 2006.  (Docket

Entry # 73, ¶ 19; Docket Entry # 73, Ex. H, p. 122).  In this

conversation, Landmark and Fresenius continued to explore

acquisition of Venofer.  (Docket Entry # 73, ¶ 19; Docket Entry #

73, Ex. H, p. 123).  Helenek stated that Galencia had still not

agreed to sell Venofer to Fresenius AG and thus Fresenius and

Luitpold would have to wait to see how those discussions

---

[7]  Landmark disputes that Fresenius made any inquiry or
attempt to acquire Venofer from Luitpold prior to June 2006
(Docket Entry # 73, ¶ 16; Docket Entry # 62, Ex. 7, p. 124, Ex.
10, p. 63 & Ex. 11, p. 17).  Fresenius asserts that its corporate
parent and Vifor's corporate parent, Galencia had communicated as
early as 2005 regarding "areas of cooperation . . . with regards
to Galencia's iron products."  (Docket Entry # 73, ¶ 16; Docket
Entry # 73, Ex. A, pp. 17 & Ex. F).  These discussions preceded
Landmark's 2006 investigation that led to obtaining Van Zandt's
authorization to contact Luitpold.  (Docket Entry # 73, ¶ 16).

progressed. (Docket Entry # 73, ¶ 19; Docket Entry # 73, Ex. H, pp. 123-24). During the discussions that Landmark facilitated between Helenek and Fresenius, specifically the November 13, 2006 meeting and December 22, 2006 conversation, the parties did not discuss a sublicensing arrangement. (Docket Entry # 73, ¶ 19; Docket Entry # 73, Ex. H, p. 126).

Eventually, Fresenius AG and Galencia reached an international arrangement and thereafter turned to North American negotiations between Fresenius and Luitpold to fit into this agreement. (Docket Entry # 73, ¶ 19; Docket Entry # 73, Ex. A, pp. 18, 22). Negotiations began in February 2007 surrounding a distribution arrangement. (Docket Entry # 73, ¶ 19; Docket Entry # 73, Ex. A, p. 20 & Ex. H, pp. 129-30). In March 2007, Van Zandt emailed Blomquist that discussions with Luitpold had shifted from an acquisition to a licensing agreement. (Docket Entry # 73, ¶ 20; Docket Entry # 62, Ex. 4(17); Docket Entry # 61, ¶ 20). In August 2007, Landmark and Fresenius extended their letter agreement to July 31, 2008. (Docket Entry # 73, ¶ 21; Docket Entry # 62, Ex. 7, pp. 32-33; Docket Entry # 61, ¶ 21). In July 2008, Fresenius publicly announced that it had reached an agreement with Luitpold entitled, "License, Distribution, Manufacturing and Supply Agreement By and Between Luitpold Pharmaceuticals, Inc., American Regent, Inc. and Fresenius USA Manufacturing, Inc." ("sublicense agreement"). (Docket Entry #

73, ¶ 23; Docket Entry # 67, ¶ 27; Docket Entry # 62, Ex. 13;
Docket Entry # 1, Ex. A, ¶ 36).

Landmark learned of the sublicense agreement in August 2008.
(Docket Entry # 73, ¶ 22; Docket Entry # 61 ¶ 22).  On September
22, 2008, Moroney requested financial details regarding the
sublicense agreement.  (Docket Entry # 62, Ex. 15(49)).  Van
Zandt replied that he asked his law department what items could
be shared because some of the information was confidential
between Luitpold and Fresenius and between Luitpold and Galencia.
(Docket Entry # 62, Ex. 15(49)).  On September 26, 2008, Van
Zandt emailed Moroney advising he was in Germany and had not yet
received direction regarding the confidentiality issue but would
"push to make information available to [Landmark] promptly."
(Docket Entry # 62, Ex. 15(50)).  On October 1, 2008, Moroney
requested Van Zandt to call him but Van Zandt replied that he was
in a meeting through lunch and would try to get to Landmark later
that day.  (Docket Entry # 62, Ex. 15(51)).  In an October 3,
2008 email to Moroney, Van Zandt stated that Fresenius' Assistant
General Counsel would contact Moroney no later than October 8,
2008, regarding the request for financial details regarding the
sublicense agreement.  (Docket Entry # 62, Ex. 14(52)).

Under a separate agreement between Luitpold and Vifor,
Luitpold holds an exclusive license to manufacture, sell and
distribute Venofer in North America.  (Docket Entry # 67, ¶ 28;
Docket Entry # 56, ¶ 28; Docket Entry # 56, Ex. I, pp. 20-21).

The sublicense agreement is between Luitpold and Fresenius (not Vifor). (Docket Entry # 62, Ex. 13). Luitpold considered Venofer its "flagship product" because it produced the largest stream of revenue.[8] (Docket Entry # 73, ¶ 25; Docket Entry # 61, ¶ 25; Docket Entry # 56, Ex. I, p. 152). The sublicense agreement between Fresenius and Luitpold allows Fresenius to exclusively market, sell and distribute Venofer in the United States, but only to end stage renal disease patients (Stage V kidney disease) at free standing dialysis clinics.[9] (Docket Entry # 67, ¶¶ 31-33; Docket Entry # 62, Ex. 13, ¶¶ 2.01(a), 2.03, pp. 5, 9; Docket Entry # 56, ¶¶ 31-33). The sale and use of Venofer in free standing dialysis clinics represents approximately 74% of the revenue stream Luitpold receives from that product. (Docket Entry # 62, Ex. 12, pp. 144-45 & Ex. 14(57), p. 2; Docket Entry # 61, ¶ 28). The sublicense agreement lasts for ten years although Fresenius may exercise an option on two additional five year extensions. (Docket Entry # 67, ¶ 39;

---

[8] Landmark claims that Venofer was also a major business intangible asset of Luitpold. (Docket Entry # 67, ¶ 41; Docket Entry # 61, ¶ 28). Fresenius denies this characterization, pointing to Helenek's belief that "an asset is something I can sell. My definition of an assets, I didn't have that." (Docket Entry # 73, ¶ 28; Docket Entry 73, Ex. H, pp. 151-52).

[9] Landmark asserts that the sublicense agreement prohibited Luitpold from manufacturing or selling Venofer to any free standing dialysis clinic in the United States. (Docket Entry # 61, ¶ 27). In Landmark's LR 56.1 statement, however, Landmark admits that the sublicense agreement allowed Luitpold to sell Venofer in free standing dialysis clinics if the patient suffered from chronic kidney disease Stages III or IV. (Docket Entry # 67, ¶ 33).

Docket Entry # 62, Ex. 13, ¶ 11.01; Docket Entry # 56, ¶ 39).
Fresenius listed the sublicense agreement as an intangible asset
on a Securities and Exchange Commission ("SEC") filing it
submitted on February 24, 2010. (Docket Entry # 67, ¶ 41; Docket
Entry # 62, Ex. 15(47)).

As set forth in paragraphs 2.06, 12.08 and 12.12 of the
sublicense agreement, Fresenius did not acquire equity or make an
equity investment in Luitpold. (Docket Entry # 67, ¶ 40; Docket
Entry # 62, Ex. 13, ¶¶ 2.06, 12.08, 12.12; Docket Entry # 56 ¶
40). Paragraph 2.06 is captioned, "No Ownership Rights Conveyed
on Effective Date." (Docket Entry # 62, Ex. 13 ¶ 2.06).
Paragraph 12.08 unequivocally states that, "nothing contained in
this Agreement shall be construed or implied to create an agency,
partnership, joint venture, or employer and employee
relationship." (Docket Entry # 62, Ex. 13 ¶ 12.08). Paragraph
12.12 likewise states that, "No rights or licenses in or to
either Party's or Vifor's patent rights, Know-How, Trade Secrets,
copyrights or trademarks shall be created or implied hereunder,
except those licenses and rights that are expressly granted in
this Agreement." (Docket Entry # 62, Ex. 13, ¶ 12.12).

Luitpold only granted Fresenius a subset of rights arising
from its license agreement with Vifor. (Docket Entry # 67, ¶ 31;
Docket Entry # 56, Ex. I, p. 31; Docket Entry # 56, ¶ 31). In
particular, under the sublicense agreement Luitpold retained the
right to manufacture Venofer in the United States. (Docket Entry

# 67, ¶ 38; Docket Entry # 62, Ex. 13, ¶¶ 3.01(vii), 6.01; Docket

Entry # 56, ¶ 38; Docket Entry # 56, Ex. I, pp. 32-34; Docket

Entry # 53, Ex. B, p. 124).  Fresenius did acquire the right to

manufacture Venofer in its field, however, it contracted this

right back to Luitpold and must purchase Venofer exclusively from

Luitpold.  (Docket Entry # 67, ¶ 38; Docket Entry # 62, Ex. 13, ¶

6.01 Docket Entry # 56, ¶ 38; Docket Entry # 56, Ex. I, p. 30).

Luitpold also has the right to market, sell and distribute

Venofer to Stage III and IV kidney disease patients outright and

Stage V kidney disease patients when treated in any setting other

than free standing dialysis clinics.[10]  (Docket Entry # 67, ¶ 33;

Docket Entry # 62, Ex. 13, p. 5; Docket Entry # 56, ¶ 33; Docket

Entry # 56, Ex. I, p. 32; Docket Entry # 53, Ex. B, pp. 124-25).

Under the sublicense agreement, Luitpold still owns the new

drug application for Venofer and must maintain Venofer's

registration with the United States Food and Drug Administration

("FDA").[11]  (Docket Entry # 67, ¶ 34; Docket Entry # 62, Ex. 13,

¶ 4.02; Docket Entry # 56, ¶ 34; Docket Entry # 56, Ex. I, pp.

---

[10]  See footnote nine (admitting Luitpold's rights to
market, sell and distribute Venofer to Stage III and IV
patients).  Landmark asserts that Fresenius obtained control over
pricing, distribution and promotion of the product in its field.
(Docket Entry # 61, ¶ 27).  Landmark, however, acknowledges that
Luitpold must approve of any promotional activities or
advertisements.  (Docket Entry # 67, ¶ 35).  Landmark maintains
that the subset of rights granted to Fresenius "constitutes a
material interest of Luitpold."  (Docket Entry # 67, ¶ 32).
[11]  Landmark admits that Luitpold still owns the new drug
application for Venofer but denies that Luitpold was solely
responsible for communicating with the FDA regarding Venofer.
(Docket Entry # 67, ¶ 34; Docket Entry # 62, Ex. 13, ¶ 3.02(a)).

34-36).  The sublicense agreement requires Fresenius to obtain approval before promoting or advertising Venofer and Fresenius must indicate that Vifor and Luitpold licensed Venofer's trademark to Fresenius.  (Docket Entry # 67, ¶ 35; Docket Entry # 62, Ex. 13, ¶¶ 3.02(a), 3.03(a) & (c); Docket Entry # 56, Ex. I, pp. 37-38).  Additionally, Fresenius must obtain Luitpold's written consent to transfer "any rights to market, promote, advertise, sell or distribute [Venofer]" and Fresenius must "use Commercially Reasonable Efforts to sell, market, detail, promote, advertise and distribute [Venofer] . . .."  (Docket Entry # 67, ¶¶ 36-37; Docket Entry # 62, Ex. 13, ¶¶ 2.04, 3.01(vi); Docket Entry # 56, ¶¶ 36-37).

Through February 14, 2011, Fresenius has paid Luitpold $36,444,442 in license or investment fee payments and $494,118,711.02 in royalty payments.  (Docket Entry # 62, Ex. 8, pp. 63, 70 & Ex. 14(58); Docket Entry # 61, ¶ 29).  Fresenius has also committed to pay Luitpold a fixed amount in licensing fees equal to $47,000,000 and a minimum of $2,100,000,000 in royalty payments during the ten year sublicense agreement.[12]  (Docket

_____

[12]  Fresenius disputes the above figures Landmark presents. (Docket Entry # 73, ¶ 29).  Specifically, Fresenius acknowledges that it agreed to pay Luitpold $47,000,000 in licensing fees but argues that the $2,100,000,000 figure is incorrect because Fresenius and Luitpold are currently renegotiating that number. (Docket Entry # 73, ¶ 29; Docket Entry # 73, Ex. H, pp. 170-72). Furthermore, Fresenius asserts that the royalty payments are the costs to purchase Venofer and costs of goods typically do not factor into calculation of consideration.  (Docket Entry # 73, ¶ 29; Docket Entry # 73, Ex. H, pp. 172-73, Ex. J, p. 60, Ex. K, p. 7).

Entry # 62, Ex. 8, pp. 60, 62 & Ex. 14(57); Docket Entry 61, ¶ 29).


<center>DISCUSSION</center>

I.  Count One:  Breach of Contract

"Under Massachusetts law, the 'interpretation of a contract is ordinarily a question of law for the court.'" Rey v. Lafferty, 990 F.2d 1379, 1384 (1st Cir. 1993).  An agreement is examined and construed "'with reference to all of its language and to its general structure and purpose and in light of the circumstances under which it was executed.'" Cofman v. Acton Corporation, 958 F.2d 494, 498 (1st Cir. 1992); accord General Convention of New Jerusalem in the U.S. of America, Inc. v. MacKenzie, 874 N.E.2d 1084, 1087 (Mass. 2007) ("words of a contract must be considered in the context of the entire contract rather than in isolation"); MCI WorldCom Communications, Inc. v. Department of Telecommunications and Energy, 810 N.E.2d 802, 810 (Mass. 2004) ("court considers the words used by the parties, the agreement taken as a whole and the surrounding facts and circumstances" to consider intent of contracting parties). Examining the words in the context of the entire writing is a search for the "manifested meaning, not a privately held belief or intent of one party . . . [left uncommunicated] to other parties to the bargain." Donoghue v. IBC USA (Publications), Inc., 70 F.3d 206, 212 (1st Cir. 1995); accord In re Newport

<center>19</center>

Plaza, Associates, L.P., 985 F.2d 640, 646 (1st Cir. 1993)

(contracts depend upon "objective indicia of consent, not on a

party's subjective expectations"); see Louis Stoico, Inc. v.

Colonial Development Corporation, 343 N.E.2d 872, 875 (Mass.

1976) ("circumstances surrounding the making of an agreement must

be examined to determine the objective intent of the parties").

Words within an agreement are "construed in their ordinary

and usual sense," Boston Edison Company v. Federal Energy

Regulatory Commission, 856 F.2d 361, 365 (1st Cir. 1988); Shane

v. Winter Hill Federal Savings and Loan Association, 492 N.E.2d

92, 95 (Mass. 1986), "unless it appears that [the words] are to

be given a peculiar or technical meaning." Woogmaster v.

Liverpool & London & Globe Insurance Company Limited, 45 N.E.2d

394, 395 (Mass. 1945). Courts also examine the location of words

within a sentence as well as the grammatical signals used, such

as commas. See Massachusetts Mutual Life Insurance Company v.

Aritech Corporation, 882 F.Supp. 190, 194-195 (D.Mass. 1995).

Both the structure and the specific words set out an agreement's

meaning. Boston Edison Company v. Federal Energy Regulatory

Commission, 856 F.2d at 366; see, e.g., McDonald's Corporation v.

Lebow Realty Trust, 888 F.2d 912, 915 (1st Cir. 1989) (noting

that fixed price option and right of first refusal appeared in

"separate paragraphs with eight intervening paragraphs between

them"). Although a term appears more than once in the agreement,

ordinarily it receives the same meaning. See Barilaro v.

Consolidated Rail Corporation, 876 F.2d 260, 265 n.10 (1st Cir. 1989) (recognizing the "'general rule in the construction of a written instrument that the same word occurring more than once is to be given the same meaning unless a different meaning is demanded by the context'").

"[I]n the absence of linguistic ambiguity, the text of a contract dictates its meaning." Okmyansky v. Herbalife Intern. Of America, Inc., 415 F.3d 154, 159 (1st Cir. 2005) (citing Stony Brook R. Corp. v. Boston & Me. R.R., 157 N.E. 607, 610 (Mass. 1927)). "'[W]ords that are plain and free from ambiguity must be construed in their usual and ordinary sense.'" Okmyansky v. Herbalife Intern. of America, 415 F.3d at 159. Contract terms receive their plain meaning and "extrinsic evidence may not be used to contradict the unambiguous terms of a contract." Commercial Union Ins. Co. v. Walbrook Ins. Co., Ltd., 7 F.3d 1047, 1052 (1st Cir. 1993).

Conversely, "a contract . . . is considered ambiguous only when the language 'is reasonably prone to different interpretations.'" Federal Deposit Insurance Corp. v. Singh, 977 F.2d 18, 22 (1st Cir. 1992); accord Bank v. Thermo Elemental Inc., 888 N.E.2d 897, 907 (Mass. 2008) (language in contract is considered "ambiguous 'where the phraseology can support a reasonable difference of opinion as to the meaning of the two words employed and the obligations undertaken'"). An ambiguity is typically construed against the drafter "if the circumstances

surrounding its use and the ordinary meaning of the words do not indicate the intended meaning of the language." Merrimack Valley Nat. Bank v. Baird, 363 N.E.2d 688, 690 (Mass. 1977); accord Nadherny v. Roseland Prop. Co., 390 F.3d 44, 49 (1st Cir. 2004) (recognizing "the interpretive ground rule that ambiguous terms are usually to be construed against the drafter."). Where the parties possess "equal sophistication and equal bargaining power," the rule does not "apply as strongly." See Falmouth Nat'l Bank v. Ticor Title Ins. Co., 920 F.2d 1058, 1062 (1st Cir. 1990) ("interpreting ambiguities against the insurer would not seem to apply as strongly when the transaction is between two parties of equal sophistication and equal bargaining power"). If contractual language is ambiguous, it is ordinarily up to the factfinder to resolve the ambiguity. Den Norske Bank AS v. First Nat'l Bank of Boston, 75 F.3d 49, 52 (1st Cir. 1996).

A. Language and Structure of the Letter Agreement

Under the terms of the letter agreement, Landmark was to act "as a non-exclusive finder and advisor to [Fresenius]" aiding Fresenius in "locating and evaluating prospective candidates to (i) contract with for the manufacture of an administratable drug for renal patients . . . or (ii) acquire an entity that manufactures the Product (a 'Transaction', as further defined below)."[13] (Docket Entry # 53, Ex. G, p. 1). Therefore, under

_____

[13] Both parties agree that Landmark was to act in this two fold capacity of either finding a company to contract with or finding a company or asset to acquire. (Docket Entry # 68, p. 5;

22

the language of the letter agreement Fresenius was interested in
two types of arrangements:  contractual or transactional.  The
distinction was important because a transaction entitled Landmark
to a transaction fee in addition to its initial $50,000 fee,
outlined as follows:

> 1.  5% of the Consideration from $1 and up to $3,000,000,
> plus
> 2.  4% of the Consideration in excess of $3,000,000 and up
> to $6,000,000, plus
> 3.  3% of the Consideration in excess of $6,000,000 and up
> to $9,000,000, plus
> 4.  2% of the Consideration in excess of $9,000,000 and up
> to $12,000,000, plus
> 5.  1% of the Consideration in excess of $12,000,000.

(Docket Entry # 53, Ex. G, p. 2-3).  Accordingly, a transaction
is not a contractual undertaking to manufacture a Candidate's
drug for renal patients.

Turning to the meaning of the term "transaction," the outset
of the letter agreement defines "transaction" as "acquir[ing] an
entity that manufactures the Product."[14]  (Docket Entry # 53, Ex.
G, p. 1).  The plain and ordinary meaning of "acquire" is "[t]o

---

Docket Entry # 67, ¶¶ 19-22; Docket Entry # 62-7, p. 16; Docket
Entry # 56, ¶¶ 19-22).

[14]  The language reads, "(ii) acquire an entity that
manufactures the product (a 'Transaction', as further defined
below)." (Docket Entry # 53, Ex. G, p. 1).  The plain and
ordinary meaning of "transaction" is "[t]he act or an instance of
conducting business or other dealings; [especially] the
formation, performance or discharge of a contract."  Black's Law
Dictionary 1635 (2009); accord The Random House Dictionary of the
English Language 2008 (1987) (defining "transact" as "to carry on
or conduct (business negotiations, activities, etc.) to a
conclusion or settlement").  Here, however, the letter agreement
uses specific language to define "transaction" which therefore
controls.

gain possession or control of; to get or obtain." Black's Law
Dictionary 26 (2009); accord The Random House Dictionary of the
English Language 18 (1987) (defining "acquire" as "to come into
possession or ownership of; get as one's own"). The plain and
ordinary meaning of "entity" is "[a]n organization (such as a
business or governmental unit) that has a legal identity apart
from its members or owners." Black's Law Dictionary 612 (2009);
accord The Random House Dictionary of the English Language 649
(1987) (defining "entity" as "something that has a real existence
. . . [especially] when considered as distinct, independent, or
self-contained"). Combining these definitions, the letter
agreement requires Fresenius to gain possession or control of an
organization in order for the business arrangement to be
considered a "transaction."

     As noted in the initial definition of "transaction," the
letter agreement "further defined [this term] below." (Docket
Entry # 53, Ex. G, p. 1). Thus, on page three, the letter
agreement states that a "transaction" shall include:

        any single transaction or series of combinations of
        transactions, other than in the ordinary course of trade or
        business whereby, directly or indirectly, control of a
        material interest of a Candidate or any of its businesses or
        assets is transferred for Consideration (as defined below)
        to [Fresenius]. A Transaction shall include, a sale or
        exchange of capital stock or assets, a merger or
        consolidation, a tender or exchange offer, leveraged buyout,
        the formation of a joint venture, majority investment or
        partnership, or any similar transaction.

(Docket Entry # 53, Ex. G, p. 3).

24

Landmark and Fresenius disagree as to the interpretation of "transaction" in light of this additional definition. Fresenius asserts that this further definition is consistent with and does not expand the scope of the original definition of transaction. (Docket Entry # 54, p. 4). For Fresenius, all of the enumerated arrangements represent a means by which it would gain equity ownership of an organization—consistent with the original definition of "transaction." According to Fresenius, the sublicense agreement between Fresenius and Luitpold does not qualify as a "transaction" because Fresenius did not gain an equity ownership of the drug Venofer.

Landmark asserts that the additional definition of "transaction" is broader in scope than Fresenius claims, only requiring Fresenius to directly or indirectly take "control of a material interest of a businesses or its assets" in exchange for consideration. (Docket Entry # 62-7, p. 18). For Landmark, although many of the enumerated arrangements result in ownership of the company or entity, not all do. (Docket Entry # 62-7, p. 18. Instead, the unifying theme of the enumerated arrangements is that each provides a path to obtain a material interest in a "Candidate or any of its businesses or assets." (Docket Entry # 65, p. 7; Docket Entry # 53, Ex. G, p. 3). In other words, Landmark argues that Fresenius does not need to acquire equity in a company to qualify as a transaction, but only has to take control of the business' assets. According to Landmark,

therefore, the sublicense agreement qualifies as a "transaction" because Fresenius gained a material business asset of Luitpold, i.e., Venofer. Fresenius responds that this interpretation is unreasonable because such an interpretation requires expanding the definition of the term "transaction" beyond its original definition rather than consistently with its other usage in the letter agreement. (Docket Entry # 54, p. 7).

As previously explained, contractual language is "ambiguous 'where the phraseology can support a reasonable difference of opinion as to the meaning of the . . . words employed and the obligations undertaken.'" Bank v. Thermo Elemental Inc., 888 N.E.2d at 907. In interpreting a contract's language, courts examine and construe an agreement "'with reference to all of its language and to its general structure.'" Cofman v. Acton Corporation, 958 F.2d at 498; accord General Convention of New Jerusalem in the U.S. of America, Inc. v. MacKenzie, 874 N.E.2d at 1087. Additionally, if a term appears more than once in the agreement it receives the same meaning "'unless a different meaning is demanded by the context.'" Barilaro v. Consolidated Rail Corporation, 876 F.2d at 265 n.10.

The further definition of "transaction" on page three provides various examples of business arrangements qualifying as a "transaction." These examples (exchange of stock or assets, merger, leveraged buyout, joint venture or partnership) uniformly denote an exchange of an entire asset or entity and, consistent

26

with the language "shall include," qualify as a transaction.  To
avoid rendering the preceding sentence superfluous, however,
these examples are not the only arrangements that qualify as a
"transaction."

The preceding sentence states that a "transaction" "shall"
include a transfer for consideration of "control of a material
interest of a Candidate or . . . its businesses or assets."
(Docket Entry # 53, Ex. G, p. 3).  This language does not
expressly encompass part of an asset and the previous definition
in the letter agreement confirms this interpretation.  Construing
"control of a material interest" of an asset to encompass part of
an asset would conflict with the language on page one of the
letter agreement, which defines "transaction" as acquiring "an
entity."  Thus, the enumerated arrangements read in conjunction
with the other definitions of "transaction" require Fresenius to
acquire "control of a material interest" of a Candidate's *entire*
asset.

The language and structure of the letter agreement do not
evidence that the parties intended "control" and "material" to
take on a peculiar meaning.  Accordingly, their ordinary and
plain meaning apply.  The plain and ordinary meaning of "control"
is "[t]o exercise power or influence over."  <u>Black's Law
Dictionary</u> 378 (2009); <u>accord</u> <u>The Random House Dictionary of the
English Language</u> 442 (1987) (defining "control" as "to exercise
restraint or direction over; dominate; command").  The plain and

ordinary meaning of "material" is "significant; essential" or
"[o]f such a nature that knowledge of the item would affect a
person's decision making."  Black's Law Dictionary 1066 (2009);
accord The Random House Dictionary of the English Language 1185
(1987) (defining "material" as "of substantial import; of much
consequence, important" or "pertinent or essential").  Therefore,
Fresenius must exercise power or influence, i.e., control, over
an essential, i.e., material, interest of a Candidate's entire
asset.

In sum, the language and structure of the letter agreement,
in its entirety, support the finding that the parties' objective
intent in defining "transaction" as "acquir[ing] an entity" was
to require Fresenius to gain possession or control of an
organization.  The further definition of "transaction" on page
three required Fresenius to control "a material interest of a
Candidate" or a Candidate's entire asset before Landmark was
entitled to the transaction fee.

B.  The Sublicense Agreement and Control of a Material Interest

Applying the interpretation of "transaction" to the
circumstances in the case at bar, the issue devolves into whether
the arrangement between Luitpold and Fresenius was a transfer for
consideration of control of a material interest of an entire
asset, i.e., Venofer.  Landmark asserts that because the
sublicense agreement gave Fresenius an exclusive license to sell
Venofer to free standing clinics in the United States and the

term of the license essentially spans 20 years, Fresenius acquired control of a material interest of Luitpold's entire product, Venofer. (Docket Entry # 62-7, p. 20). Landmark, does however acknowledge that the exclusive license Fresenius acquired was to sell Venofer to *Stage V kidney disease patients* in free standing clinics. (Docket Entry # 67, ¶ 33). Additionally, Landmark asserts that Venofer was Luitpold's "flagship product" and sales of the drug to free standing dialysis clinics represented two thirds to three quarters of the revenue Venofer generated. (Docket Entry # 62-7, p. 20).

Fresenius asserts that the sublicense agreement did not qualify as a "transaction" because Fresenius did not acquire control over Venofer. (Docket Entry # 68, p. 4). First, Fresenius argues that it could not acquire control over Venofer because Luitpold did not own the product itself. (Docket Entry # 68, p. 4). Second, Fresenius argues that Luitpold retained control over the manufacture of Venofer, its new drug application, its regulatory filings and its promotional materials, even in Fresenius' field. (Docket Entry # 68, p. 4). Third, Fresenius submits that it could not transfer its rights arising from the sublicense agreement without the prior written consent of Luitpold. (Docket Entry # 68, p. 4). Finally, Fresenius maintains that sharing Venofer's revenue with Luitpold resembles the contractual arrangement contemplated by the letter agreement, entitling Landmark to nothing more than the $50,000

consulting fee.  (Docket Entry # 68, p. 5).

As previously discussed, the plain and ordinary meaning of "control" is "[t]o exercise power or influence over." Black's Law Dictionary 378 (2009); accord The Random House Dictionary of the English Language 442 (1987) (defining "control" as "to exercise restraint or direction over; dominate; command").  The plain and ordinary meaning of "material" is "significant; essential" or "[o]f such a nature that knowledge of the item would affect a person's decision making." Black's Law Dictionary 1066 (2009); accord The Random House Dictionary of the English Language 1185 (1987) (defining "material" as "of substantial import; of much consequence, important" or "pertinent or essential").  Therefore, Fresenius must exercise power or influence over an essential interest of a Candidate's entire asset.

The facts support both parties' position and a reasonable factfinder could conclude that the sublicense agreement did or did not qualify as a control of a material interest of Venofer. In support of Landmark's position, the sublicense agreement between Fresenius and Luitpold allows Fresenius to *exclusively* market, sell and distribute Venofer in the United States to end stage renal disease patients (Stage V kidney disease) at free standing dialysis clinics.  (Docket Entry # 67, ¶¶ 31-33; Docket Entry # 62, Ex. 13, ¶¶ 2.01(a), 2.03, pp. 5, 9; Docket Entry # 56, ¶¶ 31-33).  Luitpold considered Venofer its "flagship

product" because it produced the largest stream of revenue. (Docket Entry # 73, ¶ 25; Docket Entry # 61, ¶ 25; Docket Entry # 56, Ex. I, p. 152).  Furthermore, the sale and use of Venofer in free standing dialysis clinics represents approximately 74% of the revenue stream Luitpold receives from that product.  (Docket Entry # 62, Ex. 12, p. 144-45 & Ex. 14(57), p. 2; Docket Entry # 61, ¶ 28).  Additionally, the sublicense agreement lasts for ten years with an option for two, additional five year extensions. (Docket Entry # 67, ¶ 39; Docket Entry # 62, Ex. 13, 77, ¶ 11.01; Docket Entry # 56, ¶ 39).  Finally, Fresenius listed the sublicense agreement as an intangible asset on a SEC filing it submitted on February 24, 2010.  (Docket Entry # 67, ¶ 41; Docket Entry # 62, Ex. 15(47)).

In support of Fresenius' position, Fresenius did not acquire equity or make an equity investment in Luitpold.  (Docket Entry # 67, ¶ 40; Docket Entry # 62, Ex. 13, ¶¶ 2.06, 12.08, 12.12; Docket Entry # 56 ¶ 40).  Additionally, Luitpold only granted Fresenius a subset of rights arising from its license agreement with Vifor.  (Docket Entry # 67, ¶ 31; Docket Entry # 56, Ex. I, p. 31; Docket Entry # 56, ¶ 31).  In particular, under the sublicense agreement Luitpold retained the right to manufacture Venofer in the United States.  (Docket Entry # 67, ¶ 38; Docket Entry # 62, Ex. 13, ¶¶ 3.01(vii), 6.01; Docket Entry # 56, ¶ 38; Docket Entry # 56, Ex. I, pp. 32-34; Docket Entry # 53, Ex. B, p. 124).  Luitpold also has the right to market, sell and distribute

Venofer to Stage III and IV kidney disease patients outright and Stage V kidney disease patients when treated in any setting other than free standing dialysis clinics.[15] (Docket Entry # 67, ¶ 33; Docket Entry # 62, Ex. 13, p. 5; Docket Entry # 56, ¶ 33; Docket Entry # 56, Ex. I, p. 32; Docket Entry # 53, Ex. B, pp. 124-25).

Furthermore, under the sublicense agreement, Luitpold still owns the new drug application for Venofer and must maintain Venofer's registration with the FDA.[16] (Docket Entry # 67, ¶ 34; Docket Entry # 62, Ex. 13, ¶ 4.02; Docket Entry # 56, ¶ 34; Docket Entry # 56, Ex. I, pp. 34-36). The sublicense agreement requires Fresenius to obtain approval before promoting or advertising Venofer and Fresenius must indicate that Vifor and Luitpold licensed Venofer's trademark to Fresenius. (Docket Entry # 67, ¶ 35; Docket Entry # 62, Ex. 13, ¶¶ 3.02(a), 3.03(a) & (c); Docket Entry # 56, Ex. I, pp. 37-38). Finally, Fresenius must obtain Luitpold's written consent to transfer "any rights to market, promote, advertise, sell or distribute [Venofer]." (Docket Entry # 67, ¶ 36; Docket Entry # 62, Ex. 13, ¶ 2.04; Docket Entry # 56, ¶ 36).

Thus, a genuine issue of material fact remains as to whether

---

[15] Landmark also points out that Fresenius obtained control over pricing, distribution and promotion of the product in its field. (Docket Entry # 61, ¶ 27). Landmark, however, acknowledges that Luitpold must approve of any promotional activities or advertisements. (Docket Entry # 67, ¶ 35).

[16] Landmark admits that Luitpold still owns the new drug application for Venofer but denies that Luitpold was solely responsible for communicating with the FDA regarding Venofer. (Docket Entry # 67, ¶ 34; Docket Entry # 62, Ex. 13, ¶ 3.02(a)).

under the circumstances the sublicense agreement qualified as control of a material interest of Luitpold's entire asset, Venofer.  Summary judgment in favor of Landmark or Fresenius on Count One is inappropriate.

C.  Landmark's Function as "Non-Exclusive Finder"

In an alternative argument, Fresenius claims that Landmark is not entitled to the transaction fee because Landmark was not the efficient or effective means of bringing about the sublicense agreement.  (Docket Entry # 72, p. 7).  Fresenius relies on Bonin v. Chestnut Hill Towers Realty Co., 436 N.E.2d 970, 974 (Mass.App.Ct. 1982), requiring a broker to show that its services "were the efficient or effective means of bringing about the actual sale."  Fresenius asserts that Landmark cannot satisfy the standard because Landmark brought Fresenius and Luitpold together to effectuate an acquisition, a deal much different than the eventual sublicense agreement.  (Docket Entry # 72, p. 8).  Fresenius also argues that Luitpold rejected Fresenius' attempts to acquire Venofer and the two companies only began discussing the sublicense agreement after negotiations between Galencia and Fresenius AG progressed to a point where it made sense to incorporate North American companies into their discussions. (Docket Entry # 72, p. 8).  Fresenius submits that because these corporate parent discussions preceded Landmark's efforts, Landmark is not entitled to a transaction fee.  (Docket Entry # 72, p. 8).

Landmark asserts there is no material question of fact that it brought Fresenius and Luitpold together for the business opportunity. (Docket Entry # 62-7, p. 21). Landmark claims that it acted in its capacity as finder in arranging discussions with Helenek and that those discussions led to the execution of the sublicense agreement between Luitpold and Fresenius. (Docket Entry # 62-7, p. 21-22). Landmark relies on Backman v. Smirnov, 751 F.Supp.2d 304, 311-12 (D.Mass. 2010), to establish that it fulfilled its role as finder, which requires a finder to "locate[], introduce[], and bring[] parties to a transaction together." (Docket Entry # 53, Ex. G, p. 1).

A "broker" under Massachusetts law:

> must show more than that he merely introduced the customer to the seller, or that he first interested the customer in the subject of the sale. The evidence must go far enough to justify a finding that the broker's "services were the efficient or effective means of bringing about the actual sale."

Kacavas v. Diamond, 20 N.E.2d 936, 938 (Mass. 1939); Bonin v. Chestnut Hill Towers Realty Co., 436 N.E.2d at 974. Massachusetts law, however, distinguishes between a broker and a finder. A broker is "'[a]n agent who acts as an intermediary or negotiator, esp[ecially] between prospective buyers and sellers; a person employed to make bargains and contracts between other persons in matters of trade, commerce, and navigation.'" Backman v. Smirnov, 751 F.Supp.2d at 311; Cantell v. Hill Holliday Connors Cosmopulos, Inc., 772 N.E.2d 1078, 1082 (Mass.App.Ct.

2002).  A finder is "'[a]n intermediary who brings together parties for a business opportunity . . . [a] finder differs from a broker-dealer because the finder merely brings two parties together to make their own contract, while a broker-dealer usu[ally] participates in the negotiations.'"  <u>Backman v. Smirnov</u>, 751 F.Supp.2d at 311; <u>Cantell v. Hill Holliday Connors Cosmopulos, Inc.</u>, 772 N.E.2d at 1082.  A finder "locates, introduces, and brings parties to a transaction together, while a broker does more, attempting to bring the parties to an agreement."  <u>Backman v. Smirnov</u>, 751 F.Supp.2d at 311-12; <u>Cantell v. Hill Holliday Connors Cosmopulos, Inc.</u>, 772 N.E.2d at 1082.

That said, the letter agreement sets out and establishes Landmark's role.  The parties intended Landmark to act "as a *non-exclusive* finder and advisor" to Fresenius.  (Docket Entry # 53, Ex. G, p. 1) (emphasis added).  Such language evidences the parties' intent to broaden the number of individuals or entities that could act as a finder and advisor.  In its role as "non-exclusive finder," Landmark was to either locate "prospective candidates . . . for [Fresenius] to (i) contract with . . . for the manufacture of an administratable drug for renal patients . . . or (ii) acquire an entity that manufactures the Product (a 'Transaction' . . .."  (Docket Entry # 53, Ex. G, p. 1).  For these services, Fresenius agreed to pay "[an] initial fee of $50,000.00" and additional compensation in the event of a transaction.  (Docket Entry # 53, Ex. G, pp. 2-3).  Thus, under

35

the letter agreement, Landmark was entitled to a transaction fee
if it "locate[d], introduce[d], and [brought Fresenius and
Luitpold] together" and Fresenius and Luitpold's resulting
business arrangement qualified as a transaction.  See <u>Backman v.
Smirnov</u>, 751 F.Supp.2d at 311-12; <u>Cantell v. Hill Holliday
Connors Cosmopulos, Inc.</u>, 772 N.E.2d at 1082.

A genuine issue of material fact exists regarding whether
Landmark was "a non-exclusive finder and advisor" regarding the
purported transaction embodied in the letter agreement.  Evidence
in the record supporting Landmark's position includes the
following.  In 2006, Landmark began investigating branded iron
companies identifying Luitpold as only one of two sources.
(Docket Entry # 73, ¶¶ 14-15; Docket Entry # 62, Ex. 9, p. 27 &
Ex. 10, p. 54; Docket Entry # 61, ¶¶ 14-15).  With the
authorization of Fresenius, Landmark initiated contact with
Luitpold and arranged a meeting between Fresenius and Luitpold on
November 13, 2006, though the parties were unable to reach a deal
at that time.  (Docket Entry # 73, ¶¶ 17, 19; Docket Entry # 62,
Ex. 7, pp. 124, 171 & Ex. 9, pp. 122-23; Docket Entry # 61, ¶¶
17, 19).  During the meeting, Van Zandt expressed interest in
acquiring Venofer but Helenek informed him that she did not "have
the authority or the rights to just sell the product."  (Docket
Entry # 73, ¶ 19; Docket Entry # 73, Ex. H, pp. 88-89).

After the November 13, 2006 meeting, Landmark scheduled
another conversation with Helenek for December 22, 2006.  (Docket

Entry # 73, ¶ 19; Docket Entry # 73, Ex. H, p. 122). In this conversation, Landmark and Fresenius continued to pursue acquisition of Venofer. (Docket Entry # 73, ¶ 19; Docket Entry # 73, Ex. H, p. 123). Helenek stated that Galencia had still not agreed to sell Venofer to Fresenius AG and thus Fresenius and Luitpold would have to wait to see how those discussions progressed. (Docket Entry # 73, ¶ 19; Docket Entry # 73, Ex. H, pp. 123-24). Eventually, in July 2008 Fresenius and Luitpold entered into the sublicense agreement. (Docket Entry # 73, ¶ 23; Docket Entry # 67, ¶ 27; Docket Entry # 62, Ex. 13; Docket Entry # 1, Ex. A, ¶ 36). Notably, the letter agreement describes Landmark's role as a "non-exclusive" finder or advisor as opposed to simply the finder or the advisor.

On the other hand, the record, also supports that Landmark was not the non-exclusive finder of Luitpold. Luitpold did not own Venofer but rather obtained a license from Vifor, Luitpold's owner, to manufacture, market, sell and distribute Venofer in North America. (Docket Entry # 67, ¶¶ 29-30; Docket Entry # 56, ¶¶ 29-30; Docket Entry # 56, Ex. I, pp. 19-21). Fresenius AG had been investigating the possibility of acquiring Vifor or Vifor's corporate parent, Galencia, starting no later than January 2005 as a means of obtaining Venofer.[17] (Docket Entry # 73, ¶ 16;

[17] The facts regarding the nature and timing of the interactions between the two corporate parents are disputed. Thus, a reasonable finder of fact could alternatively find that Fresenius did not make any inquiry or attempt to acquire Venofer from Luitpold prior to June 2006. (Docket Entry # 73, ¶ 16;

Docket Entry # 73, Ex. A, pp. 10, 17-20, C & F).  Discussions

between Galencia and Fresenius AG concerned an international

arrangement whereby Fresenius would distribute Venofer, a non-

acquisition opportunity.  (Docket Entry # 73, ¶ 19; Docket Entry

# 73, Ex. A, pp. 18, Ex. H, pp. 119).

Eventually, Fresenius AG and Galencia reached an

international arrangement and thereafter turned to North American

negotiations between Fresenius and Luitpold to fit into this

agreement.  (Docket Entry # 73, ¶ 19; Docket Entry # 73, Ex. A,

pp. 18, 22).  Negotiations began in February 2007 surrounding a

distribution arrangement, which eventually led to the sublicense

agreement.  (Docket Entry # 73, ¶ 19; Docket Entry # 73, Ex. A,

p. 20 & Ex. H, pp. 129-30; Docket Entry # 62, Ex. 13).  Because

the record dually supports that Landmark was or was not the non-

exclusive finder of Luitpold, a material question of fact exists.

Accordingly, it is inappropriate to allow Fresenius' motion for

summary judgment as to Count One on the alternative argument that

Landmark was not the finder of Luitpold.

D.   Section 410(f) of Massachusetts General Laws Chapter 110A

In its final alternative argument, Fresenius contends that

Landmark is statutorily precluded from its lawsuit because

Landmark failed to register as a broker-dealer in Massachusetts

under section 410(f) of Massachusetts General Laws chapter 110A

("chapter 110A").  (Docket Entry # 54, p. 12).  Fresenius bases

Docket Entry # 62, Ex. 7, p. 124, Ex. 10, p. 63 & Ex. 11, p. 17).

its argument on <u>Indus Partners, LLC v. Intelligroup, Inc.</u>, 934 N.E.2d 264 (Mass.App.Ct.), <u>review denied</u>, 939 N.E. 786 (2010), a case that involved a business agreement similar to the letter agreement. (Docket Entry # 54, p. 12).

Landmark asserts that Fresenius may not raise the statutory defense because it is an affirmative defense and Fresenius did not present it in its initial responsive pleading as required by Rule 8(c), Fed. R. Civ. P. ("Rule 8(c)"). (Docket Entry # 65, p. 8). Landmark acknowledges that Rule 8(c)'s waiver of an affirmative defense for failure to plead is not always enforced, particularly in cases where there is no prejudice or fairness dictates allowing the defense. (Docket Entry 65, p. 9). Landmark asserts, however, that in the case at bar fairness does not dictate allowing Fresenius to raise the affirmative defense. (Docket Entry # 69-3, p. 5). Fresenius maintains it should not be procedurally barred from raising this alleged affirmative defense because the <u>Indus Partners</u> decision on which it relies was not issued until well after it filed its answer. (Docket Entry # 68, pp. 6-7). Landmark points out that although Fresenius' relies on the <u>Indus Partners</u> decision to support its affirmative defense, the statute on which the claim is based has been in effect since 1972.

Fresenius claims that Landmark is not entitled to raise the defense that it was not a broker-dealer within the meaning of chapter 110A because it offered no evidence to support such a

defense.  (Docket Entry # 68, p. 10).  Landmark, in turn, asserts
that Fresenius could not simply presume that Landmark qualified
as a broker-dealer without pointing to evidence to support such a
claim.  (Docket Entry # 69-3, p. 6).  Landmark points out that
Fresenius made no discovery requests regarding Landmark engaging
in more than 15 offers to buy or sell securities in a 12 month
period as required under section 401 of chapter 110A.  (Docket
Entry # 69-3, p. 6).

Under Rule 8(c), a party must claim an affirmative defense
in its original pleadings "or the defense generally will be held
to have been waived."  <u>Federal Deposit Insurance Corp. v.
Ramirez-Rivera</u>, 869 F.2d 624, 625 (1st Cir. 1989); <u>accord</u> <u>Knapp
Shoes, Inc. v. Sylvania Shoe Manufacturing Corp.</u>, 15 F.3d 1222,
1226 (1st Cir. 1994) (stating "[a]ffirmative defenses not so
pleaded are waived").  Nevertheless, "[w]hen there is no
prejudice and when fairness dictates, the strictures of [Rule
8(c)] may be relaxed."  <u>Conjugal Partnership v. Conjugal
Partnership</u>, 22 F.3d 391, 400 (1st Cir. 1994); <u>accord</u> <u>Agri-Mark,
Inc. v. Niro, Inc.</u>, 214 F.Supp.2d 33, 43 (D.Mass. 2002) (stating
"no prejudice has resulted from its absence in the pleadings and
fairness dictates that waiver ought not be imposed").

Courts generally find statutory provisions that limit
actions for damages constitute affirmative defenses that must be
pleaded by the defendant.  <u>See</u>, <u>e.g.</u>, <u>Knapp Shoes, Inc. v.
Sylvania Shoe Manufacturing Corp.</u>, 15 F.3d at 1266-67 (requiring

40

the defendant to raise affirmative defense under a state statute that limited contractual remedies); Jakobsen v. Massachusetts Port Authority., 520 F.2d 810, 813 (1st Cir. 1975) (stating that "[w]hile a statutory limitation on liability is not enumerated among the listed [affirmative] defenses . . . it falls within the Rule's residuary clause"). Generally, the defendant bears the burden of proving the affirmative defenses it asserts. See, e.g., Pahlavi v. Palandjian, 809 F.2d 938, 943 (1st Cir. 1987) (noting the defendant possessed burden of proof over his four affirmative defenses—want of consideration, failure of consideration, duress and conditional promise); Fay v. Aetna Life Insurance & Annuity Co., 307 F.Supp.2d 284, 290 (D.Mass. 2004) (holding statute of limitations as affirmative defense "on which defendants bear the initial burden of proof"); Millen Industries, Inc. v. Flexo-Accessories Co., Inc., 5 F.Supp.2d 72, 74 (D.Mass. 1998) (placing burden of proof on the defendant to assert affirmative defense of mitigation of damages); accord New Maine National Bank v. Benner, 774 F.Supp.36, 38 (D.Me. 1991) (the "[d]efendants bear the burden of proof on affirmative defenses").

Under section 201(a) of chapter 110A, a broker-dealer must register to transact business in Massachusetts. According to section 410(f) of chapter 110A, "No person who has made or engaged in the performance of any contract in violation of any provision of this chapter . . . may base any suit on the contract." For the purposes of chapter 110A, a broker-dealer

does not include:

> a person who has no place of business in the commonwealth if
> . . . during any period of 12 consecutive months he does not
> direct more than 15 offers to sell or buy into the
> commonwealth in any manner to persons other than those
> specified in clause (A), whether or not the offeror or any
> of the offerees is then present in the commonwealth.

Mass.Gen.L.ch. 110A, § 401.

Assuming arguendo that fairness dictates allowing Fresenius to present its affirmative defense, the chapter 110A defense does not warrant summary judgment in Fresenius' favor on the merits. Fresenius bears the underlying burden on summary judgment to prove that Landmark is statutorily precluded from its lawsuit because of its failure to register as a broker-dealer pursuant to chapter 110A because Fresenius raises chapter 110A as an affirmative defense.

In order for chapter 110A to preclude Landmark from asserting its rights under the letter agreement, Fresenius must show that Landmark qualifies as a broker-dealer and is required to register in Massachusetts. See Mass.Gen.L.ch. 110A, §§ 201(a) & 410(f). Landmark would not qualify as a broker-dealer if it has no place of business in Massachusetts and did not "direct more than 15 offers to sell or buy into [Massachusetts]" over a period of 12 consecutive months. See Mass.Gen.L.ch. 110A, § 401. Landmark is a New Jersey corporation and therefore does not automatically qualify as a broker-dealer. (Docket Entry # 67, ¶ 2; Docket Entry # 56, ¶ 2). Additionally, Fresenius has not

offered any evidence on the record that establishes as a matter
of law that Landmark "direct[ed] more than 15 offers to sell or
buy into [Massachusetts]" over the last year.  On the contrary,
Fresenius asserts that it was up to Landmark to submit evidence
confirming it did not qualify as a broker-dealer.  (Docket Entry
# 68, p. 10).  Fresenius however bears the underlying burden of
proof to establish this affirmative defense.  Landmark would only
have to "produce specific facts, in suitable evidentiary form, to
establish the presence of a trialworthy issue" if Fresenius had
made a preliminary showing that Landmark qualified as a broker-
dealer.  Clifford v. Barnhart, 449 F.3d 276, 280 (1st Cir. 2006).
Fresenius fails to make this preliminary showing.  It is
therefore inappropriate to allow Fresenius' motion for summary
judgment as to Count One on the alternative argument that chapter
110A prohibited Landmark from asserting its rights under the
letter agreement.

II.  Count Two:  Unjust Enrichment

Fresenius also seeks summary judgment on the unjust
enrichment claim because Landmark possesses an adequate remedy at
law.  (Docket Entry # 54, p. 15).  According to Fresenius, the
letter agreement between Landmark and Fresenius contemplates the
sublicense agreement between Fresenius and Luitpold.   Therefore,
Landmark may only recover under a breach of contract theory and
is thus precluded from seeking unjust enrichment.  Landmark
asserts that if the sublicense agreement between Fresenius and

Luitpold did not qualify as a "transaction" under the agreement between Landmark and Fresenius, the sublicense agreement is beyond the purview of the letter agreement and Landmark may seek unjust enrichment. (Docket Entry # 65, p. 12).

Alternatively, Landmark argues that the letter agreement expired before Blomquist took steps to identify Fresenius as interested in acquiring rights to Venofer. (Docket Entry # 65, p. 12). The letter agreement was only later extended to July 31, 2008. (Docket Entry # 65, p. 12). Furthermore, Landmark claims it has established the prima facie elements for unjust enrichment. (Docket Entry # 65, p. 13). According to Landmark, it initiated contact with Luitpold, a company potentially satisfying Fresenius' RDI goals, and Fresenius accepted Landmark's efforts thereby making it inequitable absent compensation to Landmark. (Docket Entry # 73, ¶¶ 14, 15, 19; Docket Entry # 62, Ex. 7, p. 171, Ex. 9, pp. 27, 122-23, Ex. 10, p. 54; Docket Entry # 61, ¶¶ 15, 19).

Under Massachusetts law, "[a] claim of unjust enrichment is appropriate 'where an agreement is too indefinite to be enforced . . . [or] where no contract is made because each of the parties had a materially different understanding of the terms.'" Mass. Eye & Ear Infirmary v. QLT Phototherapeutics, Inc., 412 F.3d 215, 233-34 (1st Cir. 2005). Unjust enrichment requires a plaintiff to show: "(1) a benefit conferred upon the defendant by the plaintiff; (2) an appreciation or knowledge by the defendant of

the benefit; and (3) acceptance or retention by the defendant of the benefit under the circumstances would be inequitable without payment for its value." Mass. Eye & Ear Infirmary v. QLT Phototherapeutics, Inc., 552 F.3d 47, 57 (1ˢᵗ Cir. 2009).

Massachusetts cases often do not distinguish among the alternative claims of unjust enrichment—quantum meruit, quasi-contract and implied contract—because under Massachusetts law, the claims share the same common elements. Bolen v. Paragon Plastics, Inc., 747 F.Supp.103, 106 (D.Mass. 1990). When a contract does exist, plaintiffs do not have the right to receive compensation under quantum meruit because "quantum meruit presupposes that no valid contract covers the subject matter of a dispute." Boswell v. Zephyr Lines, Inc., 606 N.E.2d 1336, 1342 (Mass. 1993).

Although there is a genuine dispute as to whether Fresenius breached the letter agreement—based on whether the sublicense agreement between Fresenius and Luitpold qualified as a transaction under the letter agreement between Landmark and Fresenius—this dispute is immaterial to the outcome of the unjust enrichment claim. As referenced earlier, under the letter agreement Landmark was to assist Fresenius in locating companies to "(i) contract with . . . for the manufacture of an administratable drug for renal patients . . . or (ii) acquire an entity that manufactures the Product (a "Transaction", as further defined below)." (Docket Entry # 53, Ex. G, p. 1). The letter

45

agreement further defined "transaction" as a transfer of "control of a material interest of a Candidate or any of its businesses or assets." (Docket Entry # 53, Ex. G, p. 3). If Fresenius simply contracted with Landmark's candidate to manufacture a type of iron drug, Landmark was entitled to its initial consulting fee of $50,000. (Docket Entry # 53, Ex. G, p. 2). If Fresenius undertook a business arrangement qualifying as a transaction, Landmark was entitled to its initial consulting fee of $50,000 plus a transaction fee determined by a sliding scale. (Docket Entry # 53, Ex. G, pp. 2-3).

Whether or not the sublicense agreement between Fresenius and Luitpold constitutes a contract or a transaction, the letter agreement between Landmark and Fresenius contemplates and governs both business arrangements. Accordingly, Landmark may not seek unjust enrichment because a "valid contract covers the subject matter of [the] dispute." Boswell v. Zephyr Lines, Inc., 606 N.E.2d at 1342. If a factfinder determines that Fresenius did breach its contractual duty based on the sublicense agreement qualifying as a transaction, Landmark is entitled to damages based on the provisions of the letter agreement. If a factfinder determines that Fresenius did not breach its contractual duty because the sublicense agreement was a contract, Landmark is only entitled to the fee tied to that service.[18] Finally, there is no

_____

[18] Landmark has received payments of $200,000 from Fresenius, including the initial fee of $50,000 tied to locating a company to contract for the manufacture of iron drugs. (Docket

evidence in the record that the parties did not intend the
renewal of the letter agreement to govern any work Landmark did
on behalf of Fresenius, including work done in the interim period
between expiration and renewal.  Accordingly, Fresenius' motion
for summary judgment on the unjust enrichment claim in Count Two
is well founded.

III.  <u>Count Three:  Breach of an Implied Covenant of Good Faith
and Fair Dealing</u>

Fresenius next asserts that because Landmark premises its
claim for breach of an implied covenant of good faith and fair
dealing on its claim for breach of contract and Fresenius is
entitled to summary judgment on the breach of contract claim, it
is also entitled to summary judgment on the implied covenant
claim.  (Docket Entry # 54, p. 15).  This assertion fails
because, as previously explained, Fresenius is not entitled to
summary judgment on the breach of contract claim.  Accordingly,
it is improper to allow Fresenius' motion for summary judgment on
Count Three.

IV.  <u>Count Four:  Violation of Section 11 of Massachusetts
General Laws Chapter 93A</u>

Fresenius asserts that it is entitled to summary judgment on
Landmark's chapter 93A claim because Landmark failed to introduce
evidence demonstrating that Fresenius extorted Landmark's

---

Entry # 67, ¶ 21; Docket Entry # 56, ¶ 21; Docket Entry # 53, Ex.
B, pp. 158-59, 166).

services or did anything other than raise a good faith objection to the transaction fee to which Landmark believes it is entitled. (Docket Entry # 54, p. 16). Landmark asserts that it is entitled to damages under chapter 93A because Fresenius' code of conduct required it to comply with contracts. (Docket Entry # 65, p. 16). Additionally, Landmark claims Fresenius wrongfully rejected Landmark's attempt to collect the transaction fee after Landmark provided access to Luitpold leading to the sublicense agreement. (Docket Entry # 65, p. 16-17; Docket Entry # 1, Ex. A, ¶¶ 56, 57, 59). Landmark further asserts that Fresenius stonewalled Landmark's repeated requests for information regarding the sublicense agreement for an extended period of time. (Docket Entry # 65, p. 17; Docket Entry # 62, Ex. 14(52), Ex. 15(49), (50) & (51)).

Section 11 of chapter 93A prescribes "unfair methods of competition and unfair or deceptive acts or practice[s]." Mass.Gen.L.ch. 93A, § 2. The statute, which is "neither wholly tortious nor wholly contractual in nature," Buster v. George W. Moore, Inc., 783 N.E.2d 399, 412 (Mass. 2003), does not define either "unfair" or "deceptive." Arthur D. Little, Inc. v. Dooyang Corporation, 147 F.3d 47, 55 (1st Cir. 1998); accord Boston Pilots v. Motor Vessel Midnight Gambler and E. Coast Excursions, Inc., 357 F.3d 129, 134 (1st Cir. 2004) ("precise contours of ch. 93A liability have remained somewhat undefined . . ."). "'[W]hether a particular set of acts, in their factual

setting, is unfair or deceptive is a question of fact.'"  Damon
v. Sun Co., Inc., 87 F.3d 1467, 1484 (1st Cir. 1996).

Determining chapter 93A liability requires the court to
"focus on the nature of the challenged conduct and on the purpose
and effect of that conduct as the crucial factors in making a
G.L. c. 93A fairness determination."  Massachusetts Employers
Insurance Exchange v. Propac-Mass, Inc., 648 N.E.2d 435, 438
(Mass. 1995); accord Boston Pilots v. Motor Vessel Midnight
Gambler and E. Coast Excursions, Inc., 357 F.3d at 134; Diamond
Crystal Brands, Inc. v. Backleaf, LLC, 803 N.E.2d 744, 748-749
(Mass.App.Ct. 2004) (assessing whether "a knowing violation of
contractual obligations for the purpose of securing unwarranted
benefits" violates chapter 93A requires "consider[ing] whether
the nature, purpose, and effect of the challenged conduct is
coercive or extortionate.").  A practice is "unfair" under
chapter 93A "if it is within the penumbra of some common-law,
statutory, or other established concept of unfairness" or "is
immoral, unethical, oppressive, or unscrupulous."  PMP Assocs. v.
Globe Newspaper Co., 321 N.E.2d 915, 917 (Mass. 1975); accord
Curtis v. Herb Chambers I-95, Inc., 940 N.E.2d 413, 421 (Mass.
2010).

It is well settled that even a knowing breach of contract
does not violate section 11.  See Ahern v. Scholz, 85 F.3d 774,
798 (1st Cir. 1996).  Similarly, good faith disputes about
contractual obligations or payment of invoices do not rise to the

49

level of a chapter 93A violation. See <u>Arthur D. Little, Inc. v.</u>
<u>Dooyang Corp.</u>, 147 F.3d at 55. On the other hand, culpable
conduct in the contractual setting may take the form of coercing
a plaintiff to settle for less than he is entitled to under a
contract by withholding payment and stringing him along. See
<u>Arthur D. Little, Inc. v. Dooyang Corporation</u>, 147 F.3d at 55;
<u>Community Builders, Inc. v. Indian Motorcycle Associates, Inc.</u>,
692 N.E.2d 964, 977-78 (Mass.App.Ct. 1998). It may also take the
form of a defendant knowingly breaching a contract in order to
obtain an unbargained for advantage for itself, which the
defendant later uses to avoid the contract, all with the
knowledge that the plaintiff was in "dire financial straits" and
in no position to repudiate the agreement. <u>Nasco, Inc. v. Public</u>
<u>Storage, Inc.</u>, 29 F.3d 28, 34 (1st Cir. 1994); <u>see</u> <u>also</u> <u>Pepsi-</u>
<u>Cola Metropolitan Bottling Co., Inc. v. Checkers, Inc.</u>, 754 F.2d
10, 17-19 (1st Cir. 1985) (withholding payment as a "wedge" to
force the plaintiff to supply additional products and enhance the
defendant's bargaining power contravenes chapter 93A).

Here, Fresenius did not pay a transaction fee after Landmark
assisted Fresenius in seeking a business arrangement with
Luitpold. Pursuant to the letter agreement, Landmark
investigated branded iron companies on behalf of Fresenius,
identifying Luitpold as one of only two sources. (Docket Entry #
73, ¶¶ 14-15; Docket Entry # 62, Ex. 9, p. 27, Ex. 10, p. 54;
Docket Entry # 61, ¶¶ 14-15). Landmark initiated contact with

Luitpold's President, setting up meetings where Fresenius attempted to acquire Venofer. (Docket Entry # 73, ¶ 19; Docket Entry # 73, Ex. H, pp. 88-89). Fresenius and Luitpold eventually entered into a contract, i.e., the sublicense agreement, whereby Fresenius has the rights to exclusively market, sell and distribute Venofer in the United States to Stage V kidney disease patients in free standing dialysis clinics. (Docket Entry # 67, ¶¶ 31-33; Docket Entry # 62, Ex. 13, ¶¶ 2.01(a), 2.03, pp. 5, 9; Docket Entry # 56, ¶¶ 31-33). Landmark has received $200,000 for its services on behalf of Fresenius. (Docket Entry # 67, ¶ 21; Docket Entry # 56, ¶ 21; Docket Entry # 53, Ex. B, pp. 158-59, 166). This amount is considerably less than the amount owed under the transaction fee sliding scale, set out as follows:

> 1. 5% of the Consideration from $1 and up to $3,000,000, plus
> 2. 4% of the Consideration in excess of $3,000,000 and up to $6,000,000, plus
> 3. 3% of the Consideration in excess of $6,000,000 and up to $9,000,000, plus
> 4. 2% of the Consideration in excess of $9,000,000 and up to $12,000,000, plus
> 5. 1% of the Consideration in excess of $12,000,000.

(Docket Entry # 53, Ex. G, p. 3). As of February 14, 2011, Fresenius has paid Luitpold $36,444,442 in license or investment fee payments and $494,118,711.02 in royalty payments. (Docket Entry # 62, Ex. 8, pp. 60, 62-63, 69-70, Ex. 14(57), Ex. 14(58); Docket Entry # 61, ¶ 29).

Fresenius asserts that Landmark is not entitled to the transaction fee under the sliding scale because the sublicense

agreement between Fresenius and Luitpold did not qualify as a transaction as defined by the letter agreement. (Docket Entry # 54, pp. 4-5). As previously determined, there remains a genuine issue of fact over whether the sublicense agreement qualified as a transaction and entitled Landmark to the transaction fee. In light of this factual dispute and the existence of facts that allow a factfinder to find that the sublicense agreement was not a transaction, the circumstances evidence a good faith contractual dispute taking it outside the purview of a chapter 93A violation. See Arthur D. Little, Inc. v. Dooyang Corp., 147 F.3d at 55.

Additionally, Landmark fails to show there is a material dispute as to whether Fresenius' conduct rose to a level that was "immoral, unethical, oppressive, or unscrupulous." PMP Assocs. v. Globe Newspaper Co., 321 N.E.2d at 918. The summary judgment record contains little if any evidence of coercion. The facts do not allow a factfinder to find that Fresenius coerced Landmark to settle for less than it was entitled by withholding payment and stringing Landmark along or by showing Fresenius knowingly breached the letter agreement to obtain an unbargained for advantage, with the knowledge that Landmark was in "dire financial straits." Arthur D. Little, Inc. v. Dooyang Corporation, 147 F.3d at 55; Nasco, Inc. v. Public Storage Inc., 29 F.3d at 34. Landmark fails to argue, let alone show, it was under "dire financial straits."

Landmark's assertion that Fresenius rejected Landmark's
claim to the transaction fee in order to coerce Landmark to
settle for substantially less (Docket Entry # 1, Ex. A, ¶ 63)
lacks evidentiary support sufficient to create a genuine issue of
material fact.  Landmark highlights an email exchange between Van
Zandt and Moroney as the basis for its assertion that Fresenius
stonewalled its attempts to obtain financial information
regarding the sublicense agreement.  (Docket Entry # 65, p. 17;
Docket Entry # 62, Ex. 14(52), Ex. 15(49), (50) & (51)).  On
September 22, 2008, Moroney requested financial details regarding
the sublicense agreement.  (Docket Entry # 62, Ex. 15(49)).  In a
reply email, Van Zandt stated that he had asked his law
department what items could be shared as some of the information
was confidential.  (Docket Entry # 62, Ex. 15(49)).  On September
26, 2008, Van Zandt emailed Moroney advising he was in Germany
and had not yet received direction regarding the confidentiality
issue, but would "push to make information available to
[Landmark] promptly."  (Docket Entry # 62, Ex. 15(50)).  On
October 1, 2008, Moroney requested Van Zandt to telephone him but
Van Zandt replied that he was in a meeting through lunch and
would try to get to Landmark later that day.  (Docket Entry # 62,
Ex. 15(51)).  In an October 3, 2008 email to Moroney, Van Zandt
stated that Fresenius' Assistant General Counsel would contact
Moroney no later than October 8, 2008, regarding his request for
financial details regarding the sublicense agreement.  (Docket

Entry # 62, Ex. 14(52)).

The record shows that Fresenius was prompt in responding to communications with Landmark, many times within hours of Landmark initiating contact. In its responses, Fresenius referenced bona fide concerns of confidentiality in releasing the financial information regarding the sublicense agreement. (Docket Entry # 62, Ex. 15(49) & (50)). The email exchanges took place over a period of time of less than three weeks. (Docket Entry # 65, p. 17; Docket Entry # 62, Ex. 14(52), Ex. 15(49), (50) & (51)). Thus, the record does not support Landmark's claim that Fresenius attempted to string Landmark along in order to coerce Landmark to settle for less. Furthermore, as mentioned above, any evidence that Landmark settled for less rests on its entitlement to the transaction fee. There is no evidence in the record that demonstrates Fresenius' belief that Landmark was not entitled to a transaction fee rested on anything other than a good faith, genuine difference of opinion. <u>See Duclersaint v. Federal National Mortgage Ass'n</u>, 696 N.E.2d 536, 540 (Mass. 1998) ("a good faith dispute as to whether money is owed, or performance of some kind is due, is not the stuff of which a c. 93A claim is made"). Accordingly, Fresenius' motion for summary judgment on Count Four is proper.


<u>CONCLUSION</u>

In accordance with the foregoing discussion, it is

**RECOMMENDED**[19] that the motion for partial summary judgment filed by Landmark (Docket Entry # 59) be **DENIED**.  It is further

**RECOMMENDED**[20] that the summary judgment motion filed by Fresenius (Docket Entry # 52) be **ALLOWED** on counts two and four and **DENIED** on counts one and three.


/s/ Marianne B. Bowler

**MARIANNE B. BOWLER**
United States Magistrate Judge

---

[19]  Any objections to this Report and Recommendation must be filed with the Clerk of Court within 14 days of receipt of the Report and Recommendation to which objection is made and the basis for such objection.  <u>See</u> Rule 72(b), Fed. R. Civ. P.  Any party may respond to another party's objections within 14 days after service of the objections.  Failure to file objections within the specified time waives the right to appeal the order.
[20]  See the previous footnote.

55